**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

RANDY E. WATKINS, JR.,      )
                            )
Plaintiff,                  )
                            )
vs.                         )          No.  3:12-CV-491
                            )
CAROLYN W. COLVIN[1],       )
ACTING COMMISSIONER OF      )
SOCIAL SECURITY,            )
                            )
Defendant.                  )

## OPINION AND ORDER

This matter is before the Court for review of the Commissioner of Social Security's decision denying Disability Insurance Benefits to Plaintiff, Randy E. Watkins, Jr.  For the reasons set forth below, the Commissioner of Social Security's final decision is **REVERSED** and this case is **REMANDED** to the Social Security Administration for further proceedings consistent with this opinion pursuant to sentence four of 42 U.S.C. section 405(g).

## BACKGROUND

In July of 2009, Randy E. Watkins, Jr. ("Watkins" or "claimant") applied for Social Security Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.  Pursuant to Federal Rule of Civil Procedure 25, Carolyn W. Colvin is automatically substituted as the Defendant in this suit.

U.S.C. section 401 et seq.  The application indicated that Watkins'
disability began on February 7, 2009.

The Social Security Administration denied Watkins' initial
applications for benefits and also denied his claims on
reconsideration.  On December 15, 2010, Watkins appeared with Mr.
Jeff Bares,[2] a non-attorney representative, at an administrative
hearing before Administrative Law Judge Romona Scales ("ALJ
Scales").  Testimony was provided by the claimant and Thomas A.
Gusloff (a vocational expert or "VE").  On April 29, 2011, ALJ
Scales denied the claimant's DIB claim, finding that Watkins had
not been under a disability as defined in the Social Security Act.

The claimant requested that the Appeals Council review the
ALJ's decision and the request was denied.  Accordingly, the ALJ's
decision became the Commissioner's final decision.  *See* 20 C.F.R.
§ 422.210(a)(2005).  The claimant has initiated the instant action
for judicial review of the Commissioner's final decision pursuant
to 42 U.S.C. § 405(g) and 1383(c).


DISCUSSION

Watkins was born on July 18, 1970.  (Tr. 67).  Watkins
completed high school.  (Tr. 44).  He alleges the following
impairments:  congestive heart failure, enlarged heart, high blood

---

[2] Mr. Jeff Beres is referred to elsewhere as both Mr. Berris and Jeff
Bares.  This Court can not discern which spelling is correct and will use the
spelling utilized in the ALJ's opinion throughout - "Jeff Bares."

pressure, anxiety/panic disorder, kidney stones, history of angioplasty, chest pain, fatigue, and dizziness caused by his medications. (Tr. 170).

His past relevant work includes work as a fast food cook, retail department manager, stock clerk, and service station manager. (Tr. 29, 44). He worked as a cook at Denny's for approximately 4 years. (Tr. 47). Watkins then worked at Meijer for several years. He held various positions there, including working in the gas station, the furniture department, and the shipping and receiving department. (Tr. 45-46). His last position at Meijer was as a shift manager. (Tr. 45-46). Watkins last worked regularly at IHOP as a chef manager. (Tr. 45). This job ended in February of 2008. (Tr. 44). In early 2009, he worked briefly at a bakery. (Tr. 44).

Watkins testified that he can not work because of high blood pressure and heart problems. (Tr. 48). He claims his medications cause fatigue. (Tr. 48). He further testified that he has chest pain that radiates all the time, at various levels. (Tr. 49). He suffers shortness of breath. (Tr. 49). His heart function has improved with treatment. (Tr. 50). He testified that he has panic attacks two or three times a week, but his doctor took him off his anxiety medication because he was concerned about weight gain. (Tr. 50-51). He reports that he sometimes falls without any warning, and that Dr. Burns thinks there is some weakness in his

legs but he did not know what it was from. (Tr. 53). These falls were occurring at least once per week. (Tr. 54). He admits that he has not been treated by a psychologist or psychiatrist for anxiety or panic disorder. (Tr. 55). Watkins believes that he can be on his feet only ten minutes at a time due to chest pain and his legs giving out. (Tr. 55). He can sit no more than 45-minutes before needing to lie down, and he spends most of his day lying down. (Tr. 55).

The medical evidence of record is adequately summarized by the claimant's counsel and, in a nutshell, is as follows:

On May 9, 2009, Watkins went to the emergency room with chest discomfort, shortness of breath, dizziness, and weakness and numbness in his left arm. (Tr. 296). At the time of his admission he suffered uncontrolled hypertension. (Tr. 294). Laboratory tests revealed he had an elevated creatinine kinase ("CK")[3] level (1,258 iU/L). (Tr. 298). Watkins received numerous medications: aspirin, "nitro-paste", Lisinopril, Prilosec, and Atenolol. (Tr. 294-95). A stress test showed a left ventricular ejection fraction

---

[3] Creatine kinase or CK is an enzyme specifically found in muscle cells. When a muscle is damaged, the CK enzyme is released into the blood. Levels may be elevated following damage to the heart resulting from a heart attack, but other conditions can cause elevated CK levels too. http://www.hopkinsarthritis.org/ask-the-expert/elevated-cpk-2/ (last visited February 21, 2014). According to the Mayo Clinic, a normal CK level for an adult male is between 52 and 336 iU/L. Http://www.mayomedicallaboratories.com/test-catalog/Clinical+and+Interpretive/8336 (last visited February 21, 2014).

("EF")[4] of 32 percent.   (Tr. 294).   After seven minutes, the exercise portion of the stress test was terminated due to "dyspnea on exertion and lower extremity discomfort." (Tr. 302).   At the point the exercise portion was terminated, Watkins had achieved a total of 5.7 METS.[5]   (Tr. 302).   The stress test documented a "hypertensive blood pressure response," occasional premature ventricular contractions ("PVCs") and pronounced ST-T wave depressions during exercise.   (Tr. 302, 468).   A left heart catherization documented an EF of 25-30 percent and severe global hypokinesis.[6] (Tr. 304-05).   After being stabilized, Watkins was diagnosed with:

> 1.   Atypical chest pain probably secondary to gastroesophegeal reflux disease.
> 2. Severe left ventricular systolic dysfunction with left ventricular ejection fraction of 25 to 30 percent.
> 3.   Mild nonobstructive coronary artery disease.
> 4.   Hyperlipidemia.
> 5.   Hypertension.
> 6.   History of renal calculi.

(Tr. 294-95).

---

[4] "Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts." http://www.mayoclinic.org/ejection-fraction/expert-answers/faq-20058286 (last visited February 21, 2014).

[5] A MET is "the resting metabolic rate, that is, the amount of oxygen consumed at rest, sitting quietly in a chair, approximately 3.5 ml $0_2$/kg/min (1.2 kcal/min for a 70-kg person).   M. Jetté, K. Sidney, G. Blümchen, *Metabolic Equivalents (METS) in Exercise Testing, Exercise Prescription, and Evaluation of Functional Capacity*, Clinical Cardiology, Vol. 13, Issue 8 (1990), http://onlinelibrary.wiley.com/doi/10.1002/clc.4960130809/pdf.

[6] Hypokinesis is defined as "diminished or abnormally slow movement." http://medical-dictionary.thefreedictionary.com/hypokinesis (last visited on February 21, 2014).

Watkins was discharged on May 12, 2009, but he returned to the emergency room the next day with complaints of heart palpitations, shortness of breath, and anxiety. (Tr. 305). Watkins was given Ativan for anxiety. An EKG showed sinus tachycardia[7] and ST segment abnormalities that were "more pronounced" than previous studies. (Tr. 385). A 24-hour Holter Monitor Study was ordered. (Tr. 382). The study revealed nine premature ventricular contractions and five premature atrial contractions. (Tr. 336). During the study Watkins reported "several episodes of fatigue, feeling stressed, lightheaded, and heart fluttering" although these events did not correlate to the aforementioned premature contractions. (Tr. 336).

On May 18, 2009, Watkins' CK level was measured as 1264 iU/L. (Tr. 372). On May 19, 2009, Watkins met with a therapist[8] at HealthLink and was diagnosed with an anxiety disorder. (Tr. 483). Watkins received instructions on coping with anxiety attacks. (Tr. 483).

Watkins received regular cardiac care with Dr. Dali beginning in June of 2009. On June 3, 2009, he saw Dr. Dali and reported no chest pain, shortness of breath, heart palpitations, or leg swelling. (Tr. 455). He did have elevated blood pressure. (Tr.

---

[7] Sinus tachycardia is a heart rhythm with elevated rate of impulses originating from the sinoatrial node, defined as a rate greater than 100 beats/min in an average adult. http://en.wikipedia.org/wiki/Sinus_tachycardia (last visited February 21, 2014).

[8] The signature of the therapist is illegible.

455-56).  Dr. Dali wrote that "I suspect the hypertension is causing patient's cardiomyopathy."[9]  (Tr. 454-456).  Dr. Dali assigned Watkins a functional classification of II-III on the New York Heart Association ("NYHA") functional classification system.[10] (Tr. 454-56).

On June 11, 2009, Watkins' CK level was again elevated (1409 iU/L).  (Tr. 460).  When Watkins saw Dr. Dali on June 15, 2009, he reported experiencing dizziness.  (Tr. 449).  After examination, Dr. Dali's impressions were as follows:

> 1.     Dilated cardiomyopathy with moderately reduced left ventricular ejection fraction, EF of 30 to 35%.  The patient is Functional Classification II.
> 2.     Chronic increase in CPK of [sic] musculoskeletal in nature, unknown etiology with muscle aches.  Patient would like to have the [sic] set for muscle bx.
> 3.     Hypertension recently diagnosed.  I suspect the hypertension is causing patient's cardiomyopathy.
> 4.     Tinnitus, possibly secondary to aspirin.
> 5.     Dyslipidemia.
> 6.     History of social tobacco use.
> 7.     Deconditioning.
> 8.     Orthostatic hypotension.

(Tr. 451).  Dr. Dali explained the addictive nature of Ativan to

---

[9] Cardiomyopathy refers to diseases of the heart muscle causing the heart to become enlarged, thick, or rigid.  It has various causes, signs, symptoms and treatments.  http://www.nhlbi.nih.gov/health/health-topics/topics/cm/ (last visited February 21, 2014).

[10] Class II refers to mild heart failure where a patient's symptoms might include "[s]light limitation of physical activity.  Comfortable at rest, but ordinary physical activity results in fatigue, palpitation, or dyspnea."  Class III refers to moderate heart failure where a patient's symptoms might include "[m]arked limitation of physical activity.  Comfortable at rest, but less than ordinary activity causes fatigue, palpitation, or dyspnea."  http://www.abouthf.org/questions_stages.htm (last visited February 21, 2014).

Watkins and prescribed Remeron for anxiety instead. (Tr. 449-451).

In August, Watkins saw Dr. Dali and complained of almost constant right upper quadrant pain in his abdomen. (Tr. 444). Dr. Dali observed tenderness in the area and opined that it was likely secondary to costochondritis.[11] (Tr. 446). Dr. Dali believed Watkins needed a muscle biopsy to determine the cause of his diffuse muscle pain. (Tr. 446).

In September of 2009, Watkins saw Dr. Heather Gillespie, a rheumatologist. (Tr. 718-20). He complained of chest pain extending into his shoulder and indicated that Darvocet did not relieve his symptoms. (Tr. 718). He reported that he had chest pain regularly for the past five months. (Tr. 718). He also reported weakness in his upper extremities and shortness of breath with exertion. (Tr. 718). Dr. Gillespie noted longstanding elevated CK levels and documented tenderness to palpation along the third, fourth, and fifth costochondral junctions bilaterally and in the left shoulder. (Tr. 720). Dr. Gillespie thought Watkins may be suffering from "congenital myopathy[12] that has some sort of cardiac impact." (Tr. 720). She noted that "[w]ith the symptoms

---

[11] Costochondritis is defined as "an inflammation of the cartilage that connects a rib to the breastbone." The pain caused by costochondritis can mimic the pain of a heart attack or other heart condition. http://www.mayoclinic.org/diseases-conditions/costochondritis/basics/definition/con-20024454 (last visited February 21, 2014).

[12] Myopathy refers to neuromuscular disorders in which the primary symptom is muscle weakness due to dysfunction of muscle fiber. Other symptoms can include muscle cramps, stiffness, and spasms. http://www.ninds.nih.gov/disorders/myopathy/myopathy.htm (last visited February 21, 2014).

in his chest, it is hard to ignore that his overall ejection fraction and cardiac function is not normal." (Tr. 720).

In October of 2009, Watkins' CK level was again elevated (1162 iU/L). (Tr. 637). Dr. Gillespie injected Kenelog into Watkins' third and fourth costochondral junction on October 26, 2009, in an attempt to reduce his pain. (Tr. 640).

Watkins met with Dr. John Heroldt for a consultative psychological examination on October 13, 2009. (Tr. 593-95). Watkins complained of recurring panic attacks with shortness of breath, lightheadedness, chest tightness, loss of control, and loss of interest. (Tr. 593). He indicated that during a panic attack he feels like he is in a tunnel. (Tr. 593). Dr. Heroldt noted that Watkins "presented with flat affect with some overt anxiety noted by sweaty palms." (Tr. 593). Dr. Heroldt diagnosed panic disorder without agoraphobia and adjustment disorder with depressed mood. (Tr. 595). Dr. Heroldt assigned a GAF of 55.[13] Dr. Heroldt felt that Watkins was not capable of handling his own funds at that time. (Tr. 595).

On October 14, 2009, Dr. J. Gange, a medical consultant, reviewed the evidence of record and completed a Psychiatric Review Technique form. (Tr. 601-14). Dr. Gange assessed moderate

---

[13] GAF is a scoring system for measuring an individual's overall functional capacity. A GAF of 55 would represent moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders, DSM-IV-TR,* 32-34 (4th ed. 2000).

limitations in Watkins' ability to maintain social functioning and concentration, persistence, or pace. (Tr. 611). He then completed a mental RFC assessment and concluded that Watkins would be moderately limited in his ability to set realistic goals or make plans independently of others, interact appropriately with the general public, complete a normal workday and work without interruptions from psychologically based symptoms. (Tr. 597-98). He also believed Watkins would be moderately limited in his ability to perform at a consistent pace without an unreasonable number and length of rest periods and understand, remember, and carry out detailed instructions. (Tr. 597-98). Dr. Gange noted the following:

> While [claimant] did exhibit some objective signs to support his allegations, the severity of limitations alleged exceeds the objective findings (partially credible). [Claimant] drove himself to the MSE and was able to interact appropriately. Although he may function best away from the general public, he is capable of work.

(Tr. 599).[14]

On October 15, 2009, Watkins presented to Dr. J. Smejkal for a consultative physical examination regarding his pending claim.

---

[14] The Court notes that Watkins' attorney's rendition of Dr. Gange's statement reads as follows: "Dr. Gange noted that Randy 'did exhibit some objective signs to support his allegations' of psychological limitations and wrote that 'he may function best away from the general public.'" (DE 18 at 18). Judges and their staff painstakingly review the briefs and compare the assertions in the briefs to the record. A partial quote like this, though technically accurate, conveys an idea wholly different than that intended by the writer. This sort of misconstrual of the record rarely works in a claimant's favor.

(Tr. 615-19). At this exam, Watkins complained of chest pain, panic attacks, and being constantly tired. (Tr. 615). The exam results, however, were normal: normal strength, sensation, and reflexes, normal gait, negative straight leg raising, no difficulties moving, no problems with grip strength or fine finger manipulation, normal range of motion, normal heart rate and sounds, and no swelling in the legs. (Tr. 616-18).

On October 16, 2009, Watkins had another EKG. (Tr. 623-24). The EKG showed a moderately dilated left ventricle with a left ventricular internal dimension at the end diastole measuring 6.4 cm and an estimated EF measuring 35-40 percent. (Tr. 623).

In November of 2009, Watkins saw Dr. Gillespie and she again documented tenderness at the third, fourth, and fifth costochondral joints. (Tr. 644). Dr. Gillespie told Watkins to continue taking Flexeril to decrease pain and stiffness. (Tr. 644).

On November 30, 2009, Watkins complained to Dr. Dali, his cardiologist, of chest pain made worse by cold weather and described as "fluttery." (Tr. 643). Another EKG was ordered. (Tr. 652-654). This EKG showed that Watkins' EF had improved to approximately 50 percent. (Tr. 652-654).

In December, at a cardiology follow-up, Watkins reported persistent heart palpitations. (Tr. 658-60). Dr. Dali increased Watkins' dose of Coreg and ordered a 48-hour Holter Monitor. (Tr. 658-60). That test was performed in January. (Tr. 747, 777-99).

The Holter Monitor test revealed two non-conducted P waves, one of which caused a pause of 2.17 seconds. (Tr. 747). Watkins kept a journal of his symptoms during the test, and his reported symptoms did not correlate with the non-conducted P waves. (Tr. 747).

In February, Dr. Joelle Larsen reviewed the records and determined that the medical evidence supported Dr. Gange's December 2009 mental RFC assessment. (Tr. 678).

In March of 2010, Watkins saw Dr. Dali again and Dr. Dali concluded that, even though his ER had improved to 50 percent, he remained in Functional Classification II-III. (Tr. 730-31).

In April of 2010, Watkins CK level remained elevated at 1317 iU/L. (Tr. 767).

In June of 2010, after a fall that resulted in back pain, Watkins underwent an x-ray of his lumbar spine. (Tr. 998). It showed minimal degenerative changes. (Tr. 998).

In September of 2010, Watkins began physical therapy to alleviate lower extremity weakness. At his initial consultation, Watkins reported falling multiple times in recent weeks. (Tr. 1016). The therapist observed weakness in the lower extremities, gluteus maximum and dorsiflexors at ankles. (Tr. 1016-17). He also observed tenderness in both knees, pain with ambulation, increased knee flexion with stance, and an inability to walk on his heels or toes. (Tr. 1016-17). The therapist wrote that these deficits resulted in an abnormal gait, decreased ability to perform

activities of daily living, and "difficulty ambulating functional distances." (Tr. 1016-17).

When Watkins saw Dr. Dali on September 27, 2010, Dr. Dali recommended Watkins stop taking Remeron due to concern that recent weight gain would jeopardize his cardiac health. (Tr. 981-83). Dr. Dali again noted that his functional classification was II-III. (Tr. 981-983).

Watkins continued physical therapy through November of 2010. (Tr. 1006-15). He reported fewer falls but indicated he still fatigues quickly. (Tr. 1004). The physical therapist noted that Watkins "still hyperextends knees with stance phase of gait but is less noticeable. He ambulates with improved stability and less marked deviation with gait." (Tr. 1005). The therapist recommended continuing therapy for therapeutic exercise for strengthening and function as well as improving safety. (Tr. 1005).

On December 3, 2010, Watkins saw Dr. Stephen Burns. (Tr. 2021). Dr. Gillespie had referred Watkins to Dr. Burns for a consultation regarding his recurrent falls and lower extremity weakness. (Tr. 1021). Dr. Burns noted that Watkins:

> looks to be in a reasonable condition, but as I watch him walk he definitely has some significant issues with his quad strength. He locks out his knees when he walks so he does not lose them. He is not able to squat with any strength to his weight.

(Tr. 1021). Dr. Burns opined that Watkins "has obviously had this

for a while because he is compensating for it pretty well." (Tr. 1021).

On December 20, 2010, five days after Watkins' hearing, a muscle biopsy was performed. (Tr. 1024-25). The pathologist diagnosed active and chronic myopathy as well as "[p]ossible denervation atrophy." (Tr. 1031). The pathologist further noted:

> The scattered necrotic fibers indicate a myopathy. The marked increase in connective tissue elements implies chronicity. The rimmed vacuoles and the extremely rare congophills inclusions raise the possibility of inclusion body myopathy. The sparse endomysial inflammatory cells are too infrequent to confirm an inflammatory myopathy or inclusion body myositis in the available specimen and may represent a secondary inflammatory response to chronic muscle damage. The groups of atrophic fibers of either histechemical fiber types ... may represent a neurogenic component, but atrophic fibers can sometimes also be a myopathic feature.

(Tr. 1031).

Following the muscle biopsy results, the ALJ obtained a Medical Source Statement of Ability to do Work Related Activities from Dr. Fred Fishman. (Tr. 1031-40). Dr. Fishman concluded that the claimant could frequently lift/carry up to ten pounds and occasionally lift/carry up to 20 pounds, sit for six hours in an eight hour day, stand for four hours in an eight hour day, and walk for two hours in an eight hour day. (Tr. 1032-33). Dr. Fishman opined that Watkins could only occasionally reach, handle, finger, feel, push, or pull with his right upper extremity and would need

to avoid more than occasional exposure to hazards. (Tr. 1034-36).

Dr. Fishman further indicated that Watkins' impairments did not meet or equal a Listing. (Tr. 1039). The form indicates that, if the doctor finds that the claimant does not meet or equal a listed impairment, he is to indicate the specific Listing(s) considered and the reason the Listing is not met. Dr. Fishman's notes indicate he considered the following Listings: 4.04A (ischemic heart disease), 4.04C (coronary artery disease), and 1.02 (major dysfunction of a joint). The writing is difficult to decipher, but it appears that Dr. Fishman determined that Listing 4.04A was not met or equaled because Watkins is able to exercise, Listing 4.04C was not met or equaled because there was no significant narrowing of the arteries, and Listing 1.02 was not met or equaled because there was no major dysfunction of a joint. (Tr. 1039).

Review of Commissioner's Decision

This Court has authority to review the Commissioner's decision to deny social security benefits. 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." *Id*. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a decision." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). In determining

whether substantial evidence exists, the Court shall examine the record in its entirety but shall not substitute its own opinion for the ALJ's by reconsidering the facts or re-weighing evidence. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). With that in mind, however, this Court reviews the ALJ's findings of law de novo and if the ALJ makes an error of law, the Court may reverse without regard to the volume of evidence in support of the factual findings. *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999).

As a threshold matter, for a claimant to be eligible for DIB under the Social Security Act, the claimant must establish that he is disabled. To qualify as being disabled, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A). To determine whether a claimant has satisfied this statutory definition, the ALJ performs a five step evaluation:

Step 1:  Is the claimant performing substantial gainful activity: If yes, the claim is disallowed; if no, the inquiry proceeds to step 2.

Step 2:  Is the claimant's impairment or combination of impairments "severe" and expected to last at least twelve months? If not, the claim is disallowed; if yes, the inquiry proceeds to step 3.

Step 3:  Does the claimant have an impairment or combination of impairments that meets or equals the severity of an impairment in the SSA's Listing of Impairments, as

described in 20 C.F.R. § 404 Subpt. P, App. 1? If yes,
then claimant is automatically disabled; if not, then the
inquiry proceeds to step 4.

Step 4:    Is the claimant able to perform his past relevant work?
           If yes, the claim is denied; if no, the inquiry proceeds
           to step 5, where the burden of proof shifts to the
           Commissioner.

Step 5:    Is the claimant able to perform any other work within his
           residual functional capacity in the national economy: If
           yes, the claim is denied; if no, the claimant is
           disabled.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) and 416.920(a)(4)(i)-(v); see

also *Herron v. Shalala*, 19 F.3d 329, 333 n. 8 (7th Cir. 1994).

In this case, the ALJ found that Watkins suffered from severe

impairments that significantly affected his ability to work;

namely, coronary artery disease, unspecific muscle condition, and

costochondritis. (Tr. 23). The ALJ further found that Watkins did

not meet or medically equal one of the listed impairments but

retained the residual functional capacity ("RFC") to:

           lift and carry 20 pounds occasionally and 10
           pounds frequently, sit for six hours out of an
           eight hour workday, stand for four hours out
           of an eight hour workday, walk for four hours
           out of an eight hour workday, is unable to
           climb ladders, ropes and scaffolds, and is
           able to occasionally climb ramps and stairs,
           balance, stoop, kneel, crouch and crawl.

(Tr. 24-25).

After considering Watkins' age, education, work experience and

RFC, the ALJ determined that Watkins could not perform his past

relevant work. (Tr. 29). Relying upon the testimony of a

vocational expert, the ALJ concluded that Watkins retained the

capacity to perform a significant number of jobs despite his functional limitations, including preparer-plated ware, final assembler, and waxer. (Tr. 30).

Watkins believes that the ALJ committed numerous errors requiring reversal. First, Watkins argues that the ALJ erred at step 3 in failing to consider whether he met or equaled Listing 4.02. Next, Watkins argues that the ALJ's RFC finding is not supported by substantial evidence. Lastly, Watkins argues that the ALJ's credibility determination is flawed. This Court will begin by considering Watkins' argument that reversal is required due to error at step 3.

The ALJ's Step 3 Analysis

As noted previously, step 3 of the five-step evaluation requires an ALJ to determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925, and 416.926)("the Listings"). If Watkins demonstrates that his impairments meet or equal the criteria of a Listing, then Watkins is disabled and the analysis does not continue to steps 4 or 5. Watkins argues that the ALJ erred by failing to adequately consider and articulate whether Watkins' combined impairments equaled Listing 4.02, the Listing for chronic heart failure.

The Seventh Circuit has held that "failure to discuss or even cite a Listing, combined with an otherwise perfunctory analysis, may require a remand." *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003)(citing *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)); *see also Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002)(remanding where the ALJ's failed to discuss a relevant Listing and offered only a perfunctory consideration and analysis of the evidence.)  The mere failure to mention a Listing by name, by itself, does not necessitate a remand. *See Rice v. Barnhart*, 384 F.3d 363, 369-70 (7th Cir. 2004); *see also Knox v. Astrue*, 327 Fed. Appx. 652, 655 (7th Cir. 2004).

Undoubtedly, the ALJ should have considered Listing 4.02.  The record makes it clear that Watkins suffers from heart failure and the Listing is clearly relevant.  Accordingly, this Court must determine whether the ALJ's error requires reversal.

In *Knox*, the Seventh Circuit declined to reverse where there were two state agency physicians that opined in the record that the claimant did not meet or equal a Listing. *Knox,* 327 Fed. Appx. at 655 (declining to remand where "[t]wo state-agency physicians concluded that Knox's impairments did not meet or medically equal a Listing, and there was no medical opinion to the contrary."). Here, there is one medical opinion, from Dr. Fishman, that Watkins' impairments do not meet or equal any Listing.  But, Dr. Fishman's medical opinion in Watkins' case makes it abundantly clear that he

*did not* consider Listing 4.02. This Court's reading of *Knox* does not demonstrate that the physicians' opinions relied upon to uphold the ALJ's step 3 finding demonstrated a failure to consider the relevant Listing. Where it is clear that the doctor did not consider the relevant Listing, it is difficult to presume, without any other indication in the opinion, that the ALJ did consider it.

Watkins' non-attorney representative certainly did not help direct the ALJ's attention to the relevant Listing: he told the ALJ that he did not think Watkins met or equaled any Listing. (Tr. 42). When represented by counsel, usually such a statement would prevent a claimant from later asserting that he does meet or equal a Listing. In *Levins v. Astre*, the Court noted that:

> An ALJ is not required to explicitly reference every conceivable applicable Listing and provide a detailed analysis as to why he finds that the claimant's impairments do not meet or medically equal the Listing. This is particularly true when, like here, the claimant is represented by counsel and in the proceedings before the ALJ she referred only to [another listing]. To hold otherwise would invite claimants to strategically sandbag before the ALJ by explicitly stating that they are alleging disability under only a single Listing only to later allege, should the ALJ's decision be unfavorable, that remand is required because of the ALJ's failure to discuss the potential of medical equivalence of an arguably relevant Listing.

*Levins v. Astre*, No. 09-C-1067, 2010 WL 1881452 at *6 (E. Dist. Wis. May 10, 2010); *see also Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007)("While a claimant represented by counsel is

presumed to have made his best case before the ALJ, no such presumption attaches to an unrepresented claimant.").

The fact that Watkins was represented by a non-attorney representative rather than an attorney is important. It is a distinction the ALJ was not very careful about: at times, he seemed confused about whether Watkins was represented by an attorney or a non-attorney representative.[15] A non-attorney representative, while sometimes effective, lacks the training of an attorney and is not a substitute for an attorney.[16] Because Watkins was represented by a non-attorney representative, that non-attorney representative's failure to raise the issue of whether Listing 4.02 was met or

---

[15] The transcript refers to Watkins' non-attorney representative as his attorney sporadically throughout the record. While the ALJ acknowledged in his opinion that Mr. Bares was a non-attorney representative, later in the opinion the ALJ referred to Mr. Bares as an attorney. (Tr. 21, 24).

[16] A social security claimant has a statutory right to be represented by an attorney. *Skinner*, 478 F.3d at 841. This right can be waived, but a valid waiver requires that an ALJ explain:
> (1) the manner in which an attorney can aid in the
> proceedings,
> (2) the possibility of free counsel or a contingency
> arrangement, and
> (3) the limitation on attorney fees to 25 percent of
> past due benefits and required court approval of fees.

*Id.* (citing *Binion v Shalala*, 14 F.3d 243, 244 (7th Cir. 1994). Several courts in this circuit have found that, when a claimant has a non-attorney representative, the ALJ is required to advise the claimant of his right to counsel and obtain a waiver of that right. *See Schramm v. Astrue*, 2011 WL 1297285 (E.D. Wis. 2011)(citing *Beth v. Astrue*, 494 F.Supp.2d 979, 1001 (E.D. Wis. 2007); *Koschnitzke v. Barnhart*, 293 F.Supp.2d 943, 947 (E.D. Wis. 2003); *Meroki v. Halter*, No. 00-C-2696, 2001 WL 668951 (N.D. Ill. June 14, 2001); *Oyen v. Shalala*, 865 F.Supp. 497, 508 (N.D. Ill. 1994)). This Court does not see evidence of a waiver in the record, but because Watkins' attorney did not raise this issue it will not serve as a basis for remand here. A non-attorney representative is not a substitute for an attorney because they lack the same training. It is that same lack of training that would make a presumption that the claimant put on his best case before the ALJ inappropriate here.

-21-

equaled can not be held against Watkins in the same manner it would be if he had been represented by counsel. Accordingly, Watkins is not precluded from raising the issue of whether Listing 4.02 is met or equaled now.

In this case, there is no evidence that the ALJ considered Listing 4.02 anywhere in his decision. Although the ALJ cites to some of the relevant facts (such as Watkins' EF), he does not do so in the context of Listing 4.02. And, while there is a medical opinion of record that Watkins neither meets nor equals a Listing, that opinion makes it clear that the doctor did not consider the relevant Listing either. (Tr. 1039). Watkins' attorney concedes that he does not actually meet Listing 4.02, but instead argues that he equals it.

Listing 4.02 provides the following:

> 4.02 Chronic heart failure while on a regimen of prescribed treatment, with symptoms and signs described in 4.00D2. The required level of severity for this impairment is met when the requirements in both A and B are satisfied.
>
> A. Medically documented presence of one of the following:
>
> 1. Systolic failure (see 4.00D1a(i)), with left ventricular end diastolic dimensions greater than 6.0 cm or ejection fraction of 30 percent or less during a period of stability (not during an episode of acute heart failure); or
>
> 2. Diastolic failure (see 4.00D1a(ii)), with left ventricular posterior wall plus septal thickness totaling 2.5 cm or greater on imaging, with an enlarged left atrium greater

than or equal to 4.5 cm, with normal or elevated ejection fraction during a period of stability (not during an episode of acute heart failure);

AND

B. Resulting in one of the following:

1. Persistent symptoms of heart failure which very seriously limit the ability to independently initiate, sustain, or complete activities of daily living in an individual for whom an MC, preferably one experienced in the care of patients with cardiovascular disease, has concluded that the performance of an exercise test would present a significant risk to the individual; or

2. Three or more separate episodes of acute congestive heart failure within a consecutive 12-month period (see 4.00A3e), with evidence of fluid retention (see 4.00D2b (ii)) from clinical and imaging assessments at the time of the episodes, requiring acute extended physician intervention such as hospitalization or emergency room treatment for 12 hours or more, separated by periods of stabilization (see 4.00D4c); or

3. Inability to perform on an exercise tolerance test at a workload equivalent to 5 METs or less due to:

a. Dyspnea, fatigue, palpitations, or chest discomfort; or

b. Three or more consecutive premature ventricular contractions (ventricular tachycardia), or increasing frequency of ventricular ectopy with at least 6 premature ventricular contractions per minute; or

c. Decrease of 10 mm Hg or more in systolic pressure below the baseline systolic blood pressure or the preceding systolic pressure measured during exercise (see 4.00D4d) due to left ventricular dysfunction, despite an increase in workload; or

d. Signs attributable to inadequate cerebral perfusion, such as ataxic gait or mental confusion.

As previously noted, Watkins' counsel argues that, although Watkins does not exactly meet this Listing, his condition equals the severity of the Listing. Under the Listing, a claimant must meet or equal one of the A criteria and one of the B criteria. Watkins relies specifically upon the criteria in sections A(1) and B(3) of Listing 4.02.

With regards to section A(1), the record supports that, in May of 2009, Watkins suffered systolic heart failure with an ejection fraction as low as 25 to 30 percent. (Tr. 294-95). In addition, in October of 2009, an EKG showed a moderately dilated left ventricle with a left ventricular internal dimension at the end diastole measuring 6.4 cm and an estimated EF measuring 35-40 percent. (Tr. 623). This requirement must be met (or equaled) during a period of stability. The Commissioner argues that, because by November of 2009 Watkins' EF had improved to 50 percent, these numbers do not reflect a period of stability. No medical opinion of record has shed light on that issue or its significance in weighing whether the Listing is not met but equaled.

Listing 4.02 section B(3) requires an inability to perform an exercise tolerance test at a workload equivalent of 5 METs or less due to one of a variety of causes, including dyspnea, fatigue, palpitations, or chest discomfort. In May of 2009, Watkins reached

5.7 METS before the exercise portion of the stress test was terminated due to "dyspnea on exertion and lower extremity discomfort." (Tr. 302). Evidence submitted to the appeals council after the ALJ issued her decision indicated that, in June of 2011, a stress test was discontinued at only 4.6 METs. (Tr. 1103-1112). This Court, lacking medical expertise, can not determine how close 5.7 METs is to the Listing's requirements, but the fact that a stress test shortly after the ALJ's opinion was issued was discontinued at only 4.6 METs suggests that Watkins may have indeed been very close to meeting the Listing.

While the evidence does suggest that Watkins came very close to meeting the Listing at one point and that Watkins has several other impairments in addition to his heart failure, Watkins also has not produced a medical opinion that says his impairments *do* equal Listing 4.02. The burden at step 3 ultimately rests with Watkins. But, this Court can not play doctor any more than an ALJ can, and there are not medical opinions of record that this Court can rely upon to find that the ALJ's failure to consider Listing 4.02 was harmless. The ALJ did commit error, and on the record before this Court, that error is not clearly harmless.

Credibility

Watkins argues that the ALJ improperly discredited his testimony in violation of SSR 96-7p by relying on meaningless

boilerplate language and offering reasons that were unreasonable or unsupported. The Commissioner disagrees.

Because the ALJ is best positioned to judge a claimant's truthfulness, this Court will overturn an ALJ's credibility determination only if it is patently wrong. *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). However, when a claimant produces medical evidence of an underlying impairment, the ALJ may not ignore subjective complaints solely because they are unsupported by objective evidence. *Schmidt v. Barnhart*, 395 F.3d 737, 745-47 (7th Cir. 2005); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

Further, "the ALJ cannot reject a claimant's testimony about limitations on [his] daily activities solely by stating that such testimony is unsupported by the medical evidence." *Id*. Instead, the ALJ must make a credibility determination that is supported by record evidence and sufficiently specific to make clear to the claimant, and to any subsequent reviewers, the weight given to the claimant's statements and the reasons for the weight. *Lopez v. Barnhart*, 336 F.3d 535, 539-40 (7th Cir. 2003).

In evaluating the credibility of statements supporting a Social Security application, an ALJ must comply with the requirements of SSR 96-7p. *Steele v. Barnhart*, 290 F.3d 936, 941-42 (7th Cir. 2002). This ruling requires ALJs to articulate

"specific reasons" behind credibility evaluations; the ALJ cannot merely state that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." SSR 96-7p. Furthermore, the ALJ must consider specific factors when assessing the credibility of an individual's statement including:

1.　The individual's daily activities;

2.　The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.　Factors that precipitate and aggravate the symptoms;

4.　The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.　Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.　Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.　Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p; C.F.R. §§ 404.1529, 416.929; *Golembiewski*, 322 F.3d 912, 915-16 (7th Cir. 2003).

Here, ALJ Scales determined that "the claimant's medically determinable impairments could reasonably be expected to cause the

alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 25). Nearly identical language was criticized by the Seventh Circuit in *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). That criticism will not be repeated here. The boilerplate language utilized by ALJ Scales is unhelpful at best, and by itself, such language is inadequate to support a credibility finding. *See Richison v. Astrue*, No. 11-2274, 2012 WL 377674 (7th Cir. 2012). But, where boilerplate language such as that utilized by the ALJ is accompanied by additional reasons, a credibility determination need not necessarily be disturbed if otherwise adequate. *Id.* The Commissioner argues that the ALJ's opinion contains more that mere boilerplate language and should be upheld. According to the Commissioner:

> In assessing the credibility of Plaintiff's subjective complaints, the ALJ properly considered the objective medical evidence, the physician opinions, Plaintiff's improvement with treatment, the absence of any psychological treatment, Plaintiff's own statements regarding the improvement in his cardiac symptoms, and the statements of Plaintiff's wife. (Tr. 25-29). Substantial evidence supports the ALJ's credibility assessment and the Court should decline Plaintiff's invitation to re-weigh the evidence on this issue.

(DE 21 at 11).

In his opinion, the ALJ outlined the process for determining a claimant's RFC, including the need to make a credibility finding where statements about the intensity, persistence, of functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence. (Tr. 25). The ALJ then briefly summarized the claimant's testimony as follows:

> At the hearing, the claimant testified that he underwent surgery to unclog a coronary artery in 2008. He also explained that he experiences chest pain and shortness of breath, and his medications cause him to be fatigued. The claimant estimated that he can walk for 10 minutes at a time before his legs give out, sit for 45 minutes before having to lie back down, stand for five to ten minutes, and lift 10-15 pounds.

(Tr. 25). He then included the boilerplate language cited earlier and offered a summary of the medical evidence. (Tr. 25-26). The ALJ then offered further analysis of Watkins' credibility as follows:

> After considering the claimant's allegations and complaints, the undersigned finds him to be less than fully credible. The record indicates that the claimant's coronary artery disease is mild and his left ventricular ejection fraction improved to 50 percent, which is within the lower limits of the normal range. Also, the claimant's chest pain is reportedly well controlled with medication, and a recent examination revealed only minimal tenderness on the left side of the chest wall. The physical consultive examiner noted that the claimant had a normal gait and full use of his upper and lower extremities. In addition, despite undergoing several tests, the claimant has not been given a definitive diagnosis for his muscle condition, as MRIs of his thighs were essentially normal and a muscle biopsy

indicated possible inflammatory myopathy. Furthermore, the record does not support the claimant's allegations of anxiety or panic attacks, as he has not sought treatment for this condition.

(Tr. 26-27).

This Court must decide whether there is a logical bridge between the evidence outlined by the ALJ and the ALJ's conclusions. Watkins makes several arguments regarding why the ALJ's analysis is insufficient, but one in particular is of concern to this Court.

The ALJ stated that Watkins' allegations of anxiety or panic attacks were not supported by the record because he has not sought treatment. Watkins *did* receive treatment for anxiety or panic attacks. On May 13, 2009, when his problems first began, he was given Ativan for anxiety. (Tr. 385). On May 19, 2009, Watkins met with a therapist at HealthLink and was diagnosed with an anxiety disorder. (Tr. 483). Watkins received instructions on coping with anxiety attacks. (Tr. 483). In June of 2009, Dr. Dali prescribed Remeron to Watkins for anxiety in place of Ativan. (Tr. 449-51). In October of 2009, Dr. Heroldt diagnosed panic disorder without agoraphobia and adjustment disorder with depressed mood.[17] (Tr. 595). Watkins took Remeron for over a year before, on September 27, 2010, Dr. Dali recommended Watkins stop taking Remeron due to concern that recent weight gain would jeopardize his cardiac

---

[17]Dr. Heroldt's opinions were given little weight by the ALJ because the ALJ believed they were "inconsistent with the record as a whole, which indicates that the claimant has never undergone psychiatric treatment for his alleged anxiety, which suggests that his symptoms are not [as] severe as alleged." (Tr. 28).

health.  (Tr. 981-83).

While Watkins did testify that he had never seen a psychiatrist or psychologist for his anxiety (Tr. 55), he did see both a therapist and a medical doctor who prescribed medication for anxiety for an extended period of time.  Accordingly, the ALJ's statement that Watkins did not get treatment for anxiety is not supported by the record.

Furthermore, even if the ALJ were correct that Watkins had not sought treatment for anxiety, he was not entitled to rely on that reason to find Watkins not credible without inquiring into the reason for the lack of treatment.  SSR 96-7p provides that:

> ... the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure. However, the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment.  The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner. . . .

SSR 96-7p.  If the ALJ wanted to rely on Watkins' perceived lack of treatment to support his credibility finding, then he should have

inquired into the reason for the lack of treatment and nothing in the record suggests this was done. *See Shauger v. Astrue*, 675 F.3d 690, 696-698 (7th Cir. 2012)(reversing where an ALJ both failed to seek an explanation for a perceived lack of treatment and the analysis rested on a misreading of the administrative record); *Craft v. Astrue*, 539 F.3d 668, 678-79 (7th Cir. 2009)(reversing where the ALJ drew a negative inference as to the claimant's credibility from his lack of medical care without inquiring regarding the reason and where medical records reflected that the claimant had reported an inability to pay for treatment). The failure to inquire into the reason for Watkins' perceived lack of treatment combined with the ALJ's misconstrual of the record lead this Court to conclude that the ALJ has failed to build a logical bridge between the evidence and her conclusion regarding Watkins' credibility.

Watkins' Remaining Arguments

Having found remand necessary on the basis of the ALJ's inadequate step 3 and credibility findings, this Court finds no compelling reason to address Watkins' remaining arguments in detail. This Court has considered Watkins' request that this Court award benefits rather than remand the case for additional proceedings but finds remand more appropriate here. This Court makes no findings regarding the merits of Watkins' DIB claim. On remand, the ALJ should consider all of the evidence in the record,

and, if necessary, give the parties the opportunity to expand the
record so that the ALJ may build a logical bridge between the
evidence and his conclusions.

CONCLUSION

For the reasons set forth above, the Commissioner of Social
Security's final decision is **REVERSED** and this case is **REMANDED** for
proceedings consistent with this opinion pursuant to sentence four
of 42 U.S.C. section 405(g).

**DATED: February 21, 2014**                **/s/ Rudy Lozano, Judge**
                                        **United States District Court**